# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

EBERTO BAUTISTA,

     Plaintiff

v.

NEVADA DEPARTMENT OF
CORRECTIONS, et. al.,

     Defendants

Case No.: 3:18-cv-00194-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 59, 60

     This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is Plaintiff's Motion for Summary Judgment. (ECF Nos. 59, 59-1, 59-2.) Defendants filed a belated response to the motion on October 26, 2020. (ECF No. 72.) Plaintiff filed a reply. (ECF No. 74.)

     Plaintiff also moved to strike the untimely response. (ECF No. 73.) Defendants responded that Plaintiff was not prejudiced by the untimely filing as the court had not yet ruled on the motion for summary judgment and because they had effectively opposed his motion in their own motion for summary judgment. (ECF No. 75.) Plaintiff filed a reply in support of his motion to strike. (ECF No. 76.) The undersigned issued a separate order denying Plaintiff's motion to strike the untimely response (ECF No. 77), and has considered Defendants' response as well as Plaintiff's reply in connection with this Report and Recommendation.

1    Also before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 60, 60-1

2    to 60-17, errata at ECF No. 64-1.) Plaintiff filed a response. (ECF Nos. 67, 67-1, 67-2.)

3    Defendants filed a reply. (ECF No. 68.)

4    After a thorough review, it is recommended that Plaintiff's motion be denied, and

5    Defendants' motion be granted.

6    **I. BACKGROUND**

7    Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC),

8    proceeding pro se with this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and

9    Institutionalized Persons Act of 2000, 42 U.S.C. § 2000 (RLUIPA). (Compl., ECF No. 7.) The

10    events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional

11    Center (LCC). (*Id.*) Defendants are former NDOC Director James Dzurenda, former LCC

12    Warden Renee Baker, LCC Culinary Food Services Manager Maribelle Henry, and Rabbi

13    Yisroel Rosskamm. (*See* Screening Order at ECF No. 6.) Current NDOC Director Charles

14    Daniels was substituted in place of Dzurenda under Federal Rule of Civil Procedure 25(d)

15    insofar as Dzurenda was sued in his official capacity. (ECF No. 45.)

16    The court screened Plaintiff's complaint and allowed him to proceed with claims under

17    the First Amendment's Free Exercise Clause, RLUIPA, and the Fourteenth Amendment's Equal

18    Protection Clause. (ECF No. 6.) His Eighth Amendment conditions of confinement claim was

19    dismissed with prejudice. (*Id.*)

20    The First Amendment and RLUIPA claims were allowed to proceed based on allegations

21    that Plaintiff practices Messianic Judaism, and was not provided a kosher diet that was prepared

22    and served in a proper kosher setting, and that he was prevented from obtaining items necessary

23    to practice his religion due to his indigent status. The court allowed Plaintiff to proceed with an

equal protection claim based on allegations that prison officials discriminated against Jewish inmates by not serving them hot meals or meat.

Specifically, Plaintiff alleges that he was provided a "one-size fits all," vegetarian diet[1] where the same items were served each week, while mainline inmates received a variety. He claims that he received quinoa, unwashed cabbage and freezer burned oranges and apples. Mainline inmates, on the other hand, receive 13 meat servings per month for breakfast, 22 meat servings per month for lunch, and 25 meat servings per month for the evening meal. He alleges that under Administrative Regulation (AR) 814, all foods purchased for the program, except for fresh fruits and vegetables are to be certified and have an appropriate recognized standard kosher symbol. He contends that he was provided with freezer burned fruits and vegetables that were not fresh. He further avers that the prison hired Rabbi Rosskamm to certify the common fare diet as kosher to punish inmates seeking a kosher diet by turning them into vegetarians, and serving them non-kosher fruits and vegetables.

Plaintiff also alleges that he has to use non-kosher tap water served from an unclean water Cambro dispenser, and the kosher food preparation area was not adequately supervised, which allowed for cross-contamination. His meals are put on non-sterile Styrofoam, and are only wrapped once. He claims he has to eat on tables that are cleaned with filthy rags and possibly contaminated with e-coli and fungus. He asserts that Defendants fail to post rabbinical health inspection reports in the kosher food preparation area, but post the health inspection certificates

---

[1] At times Plaintiff calls the menu primarily vegan, and at other times he refers to it as primarily vegetarian. Presumably, he means to refer to it as vegetarian as his own evidence reflects that some meat as well as eggs and milk are served with the Common Fare menu, which would indicate it is not vegan. A vegan is "a person who does not eat any animal products such as meat, milk or eggs or use animal products such as leather or wool." *See* *https://www.oxfordlearnersdictionaries.com/us/definition/english/vegan_1?q=vegan,* last visited December 10, 2020.

for the mainline culinary area. He further contends that his meals were prepared by "Jew-hating" inmates with swastika tattoos.

Plaintiff goes on to assert that AR 810 requires faith groups who require special consumable food for worship such as grape juice, bread or other kosher items, to obtain them for themselves from the canteen, an approved vendor or an approved religious organization. He claims that having grape juice and kosher bread is a central tenet to the Messianic Sabbath. He is an indigent inmate and must rely on NDOC to provide him with the items necessary to practice his faith.

Finally, Plaintiff avers that he can only eat cold foods on Shabbat and high holy days, while regular mainline inmates receive a hot entrée on their holy days.

Plaintiff moves for summary judgment, arguing: (1) the Common Fare diet he was served did not comply with his dietary needs and he was served a primarily vegetarian diet with no dessert while mainline inmates received a significant amount of meat in their meals; (2) AR 814 allows non-kosher foods to be served to inmates receiving the Common Fare diet; and (3) AR 810 is unconstitutional insofar as it provides that faith groups who require special consumable foods for worship, such as grape juice, bread, or kosher items, must obtain those items themselves from the canteen, an approved vendor or approved religious organization.

Defendants also move for summary judgment, arguing: (1) the facts call into question the sincerity of Plaintiff's religious beliefs; (2) Defendants have not burdened his religious practice and the Common Fare diet is reasonably related to legitimate penological interests; (3) Defendants are entitled to qualified immunity because the complaint only contains threadbare recitals and does not allege what individual action was taken by each Defendant to violate his rights; (4) Plaintiff's equal protection claim does not challenge any particular statute

1   or regulation, he has not established he was treated differently than similarly situated evidence,

2   and he has no evidence of discriminatory intent on the part of any of the Defendants;

3   (5) Plaintiff's RLUIPA claim fails because he cannot demonstrate any burden on his religious

4   practice; and (6) Defendants are entitled to qualified immunity as to all money damages because

5   the formulation of the Common Fare diet and its implementation was completed under rabbinical

6   supervision to ensure compliance with kosher dietary laws.

7   ## II. LEGAL STANDARD

8       The legal standard governing this motion is well settled: a party is entitled to summary

9   judgment when "the movant shows that there is no genuine issue as to any material fact and the

10  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

11  *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

12  evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

13  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

14  of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary

15  judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

16  other hand, where reasonable minds could differ on the material facts at issue, summary

17  judgment is not appropriate. *Anderson*, 477 U.S. at 250.

18      "The purpose of summary judgment is to avoid unnecessary trials when there is no

19  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

20  F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

21  of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

22  U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

23  one party must prevail as a matter of law"). In considering a motion for summary judgment, all

1   reasonable inferences are drawn in the light most favorable to the non-moving party. *In re*

2   *Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

3   *& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

4   nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

5   477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

6   determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

7   *Anderson*, 477 U.S. at 249.

8           In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

9   "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

10  come forward with evidence which would entitle it to a directed verdict if the evidence went

11  uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

12  the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

13  *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

14  omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

15  defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

16  an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

17  party cannot establish an element essential to that party's case on which that party will have the

18  burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

19          If the moving party satisfies its initial burden, the burden shifts to the opposing party to

20  establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

21  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

22  dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

23  be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

**A. The Contours of Plaintiff's Claims**

As a preliminary matter, the court agrees with Defendants that the issues Plaintiff raises in his own motion for summary judgment and in his response to Defendants' motion extend far beyond the allegations contained within his complaint. "A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000).

Specifically, Plaintiff raises the following issues that were not raised in the complaint, that the court will not consider as part of this action: that his religious rights are being violated because he is not being served a menu consisting or organic fruits, vegetables and meat[2]; that homosexual inmates are preparing his foods; that he should not have to go and pick up his meals on the Sabbath; that inmates who celebrate Passover, who are not receiving the Common Fare diet, are only provided a holiday meal on one day of Passover; Common Fare inmates are deliberately targeted to be removed from Common Fare if they accept mainline food, but if a

---

[2] The complaint makes no mention of the failure to provide him an organic diet. Instead, Plaintiff's complaint specifically states that his sincere religious belief requires a "kosher diet" as a tenet of his belief. (ECF No. 7 at 8.)

mainline inmate eats Common Fare  food, nothing is done; and, requiring him to sign a Common Fare agreement that precludes him from eating mainline, non-kosher meals, violates his religious rights.

Plaintiff's motion and opposition also reference claims under the Eighth Amendment as well as various Nevada statutes, which were dismissed on screening. As such, the court will not address those claims here.

**B. First Amendment Free Exercise Clause & RLUIPA**

**1. First Amendment Free Exercise Clause Standard**

"The First Amendment, applicable to state action by incorporation through the Fourteenth Amendment … prohibits government from making a law prohibiting the free exercise [of religion]." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citations and quotation marks omitted). "The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008).

To implicate the Free Exercise Clause, a prisoner must first establish his belief is both sincerely held and rooted in religion. *See Shakur*, 514 F.3d at 884-85. Then, a person asserting a free exercise claim must show "that the government action in question substantially burdens the person's practice of her religion." *Jones v. Williams*, 791 F.3d 1023, 1032 (9th Cir. 2015) (citation omitted). "A substantial burden … place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious

beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (citation and internal quotation marks omitted).

"[A]lleged infringements of a prisoners' free exercise rights are judged under a reasonableness test [that is] less restrictive than that ordinarily applied to alleged infringement of fundamental constitutional rights." *Id.* (citing *O'Lone*, 482 U.S. at 349). "The challenged conduct is valid if it is reasonably related to legitimate penological interests." *Id.* (quotation marks omitted, citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). The "reasonableness" factors outlined in *Turner* are: (1) "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives" and "the existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91; *see also O'Lone*, 482 U.S. at 349.

## 2. RLUIPA

Section 3 of RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

"The Supreme Court has recognized RULIPA as … [a] 'congressional effort[ ] to accord religious exercise heightened protection from government-imposed burdens[.]" *Greene v. Solano County Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 714

1    (2005)). Nevertheless, "[c]ourts are expected to apply RLUIPA's standard with due deference to

2    the experience and expertise of prison and jail administrators in establishing necessary

3    regulations and procedures to maintain good order, security, and discipline, consistent with

4    consideration of costs and limited resources." *Hartmann*, 707 F.3d at 1124 (internal quotation

5    marks and citation omitted).

6         "Under RLUIPA, the challenging party bears the initial burden of proving that his

7    religious exercise is grounded in a sincerely held religious belief …, and that the government's

8    action substantially burdens his religious exercise." *Holt v. Hobbs*, 135 S.Ct. 853, 857 (2015)

9    (citations omitted). A substantial burden "must impose a significantly great restriction or onus

10   upon such exercise." *Greene*, 513 F.3d at 987 (quoting *San Jose Christian Coll v. City of*

11   *Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).

12        If the plaintiff makes a showing of a substantial burden on the exercise of his religion, the

13   court's analysis then turns to whether the defendant has established that burden furthers "a

14   compelling interest," and does so "by the least restrictive means." 42 U.S.C. § 2000cc-1(a), (b);

15   *Holt*, 135 S.Ct. at 857 (citation omitted).

16        **3. Sincerely Held Belief**

17        Plaintiff states in his declaration that he first attended the Messianic Judaism group at

18   LCC in 2015 or 2016; he is listed on NDOC's faith declaration form as being a practitioner of

19   Messianic Judaism; and he placed a request to receive the religious Common Fare diet under AR

20   814 in April of 2016. (Pl. Decl., ECF No. 59-1 at 1-3 ¶¶ 3, 4, 8.) The tenets of his faith include

21   keeping the dietary laws set forth in Leviticus, chapter 11. (*Id*. at 3-8 ¶¶ 9(c)-(j).) He requires

22   meats that are kosher and unprocessed, as well as clean fruits and vegetables. (*Id*. at 9 ¶¶ 9(m),

23

1  (n.).)[3] In addition, He must have bread (matzah) and grape juice for the Sabbath service and for

2  high holy days. (*Id.* at 10 ¶ 9(o).)

3        Defendants argue that Plaintiff is not sincere in his belief that he must adhere to a kosher

4  diet because he has purchased items from the canteen for personal use that are not kosher, such

5  as pork rinds, shrimp ramen, and Cheetos. (ECF No. 60-3) In addition, Plaintiff has violated his

6  Common Fare agreement by taking mainline, non-kosher meals on several occasions. (ECF Nos.

7  60-5, 60-7, 60-8, 60-9.)

8        In response, Plaintiff states that he sometimes took a mainline meal because he had a

9  craving for real meat, and sweets, which he did not receive with his Common Fare meal. (Pl.

10  Decl., ECF No. 59-1 at 16-17 ¶ 10(p).) He also claims that he took mainline meals because he

11  was tired of the repetitious meals served without meat, while mainline inmates received meat and

12  desserts. (Pl. Decl., ECF No. 67-2 at 17 ¶ 12p.) He explains his purchase of non-kosher items

13  from the commissary by stating he purchases things for his cellmate to eat. (Pl. Decl., ECF No.

14  67-2 at 21 ¶ 27.)

15        There is a genuine dispute of material fact as to whether Plaintiffs' beliefs regarding his

16  kosher diet are sincerely held. On the one hand, Plaintiff presents a declaration that he must eat a

17  kosher diet to maintain his faith, and that he is required to have kosher bread and grape juice for

18  Sabbath and high holy days. On the other hand, Defendants provide evidence that Plaintiff has

19  taken mainline meals on several occasions and has ordered various non-kosher items from the

20

21

---

22  [3] In his declaration, Plaintiff states that he requires organic meats, fruits and vegetables, but his
complaint did not allege that his kosher diet was deficient because it was not organic; therefore,

23  the court will not address that aspect of his argument here. He also states that he believes his
meals should not be prepared by a homosexual, but that also was not part of the complaint and
will not be addressed here.

1   commissary. While Plaintiff claims he gives these items to his cellmate, a fact finder could

2   reasonably believe either side's version of events.

3       The court will now address whether, assuming Plaintiff has sincerely held beliefs about

4   his religious diet, his religious practice was substantially burdened by Defendants, which is a

5   requirement Plaintiff must demonstrate to prevail on both his First Amendment free exercise and

6   RLUIPA claims.

7       **4. Substantial Burden**

8       Plaintiff's allegations about the substantial burden on his religious practice can be broken

9   up into the following groups: (1) he was not given an adequate kosher diet; (2) the meals were

10  not prepared in an adequate kosher setting; and, (3) he had to obtain group worship consumables

11  such as grape juice and kosher bread from the canteen, an approved vendor or an approved

12  religious organization.

13          **a. AR 814**

14      AR 814 sets forth NDOC's inmate Common Fare (religious diet) program. (ECF No. 59-2

15  at 17-38; ECF No. 60-10.) The purpose of the Common Fare program is to "accommodate

16  inmates whose sincere religious/spiritual dietary needs cannot be met by the Master Menu

17  without prohibiting their free exercise of or without substantially burdening their sincere

18  religious/spiritual exercise in a manner that is prohibited by controlling legal authority."

19  (ECF No. 59-2 at 17, ECF No. 60-10 at 2, AR 814.02.1.) AR 814 states that the Common Fare

20  program is intended to: promote institutional safety, security, discipline and order, consistent

21  with consideration of cost and limited resources; promote efficient planning, ordering,

22  preparation, and delivery of religious/spiritual dietary meals to inmates while conserving

23  financial resources and preventing waste. (*Id.*, AR 814.02.2.A-B.)

The Common Fare menu is certified to meet or exceed minimum daily nutritional requirements and is confirmed to meet or exceed Kosher Orthodox Union standards. (ECF No. 59-2 at 18, ECF No. 60-10 at 3, AR 814.02.3.)

All foods purchased for the Common Fare program, except for fresh fruits and vegetables, will be certified by an appropriate recognized standard symbol (kosher symbol). (*Id.*, AR 814.02.7.) All foods are to be prepared with designated Common Fare equipment and in designated Common Fare areas. (*Id.*, AR 814.02.8.) The food products are stored in separate refrigeration, frozen and storage spaces. (ECF No. 59-2 at 22, ECF No. 60-10 at 7, AR 814.04.1.A-C.) Common Fare food service personnel are instructed not to handle non-common fare food items while preparing common fare food items, and all food preparation is to be conducted in the Common Fare area. (ECF No. 59-2 at 23, ECF No. 60-10 at 8, AR 814.04.2.B-C.)

### b. The Common Fare Diet

According to Plaintiff, the Common Fare diet is primarily vegetarian, with a few servings per week of tuna and processed lunch meats. (Pl. Decl., ECF No. 59-1 at 14 ¶ 10(f).) The mainline menu from 2015 to 2018, on the other hand, had 12 breakfasts per month served with meat, 20 lunches per month served with meat, and 28 dinner meals per month served with meat. The mainline dinner was served with dessert while Common Fare inmates do not get dessert. (Pl. Decl., ECF No. 59-1 at 14-15 ¶ 10(g).) He claims that the vegetables served are "sometimes dirty with cracks in them and unusual discolorations" and "appear to be unwashed." (*Id.* at 15 ¶ 10(k).) The quinoa and bean cakes as well as the mashed potatoes are bland. (*Id.* at 16 ¶ 10(l).) The common fare fruits and vegetables are the same as those offered to mainline inmates, and are stored in a cooler where all inmates have access to them. (*Id.* at 16 ¶ 10(m).) In his declaration in

1   opposition to Defendants' motion he claims that the meal does not comply with his scriptural

2   commands because the fresh fruits and vegetables are not required to carry a kosher symbol, and

3   beverages are not required to be kosher. (Pl. Decl., ECF No. 67-2 at 20 ¶ 24.)

4       Defendants assert that Plaintiff has been provided with a kashrut compliant kosher diet.

5   They provide a declaration from Rabbi Rosskamm who states that while the menu is "heavy" on

6   vegetarian items, there are meat items served, and it is a kosher menu. Defendants contend there

7   is no evidence that the diet provided is not kosher.

8       Scroll K was retained to consult with NDOC and to certify its kosher-meal program, the

9   Common Fare program, as kosher. (Henry Decl., ECF No. 60-16 at 3 ¶ 7.) Common Fare is

10  prepared in a separate, kosher kitchen, which is under 24-hour video monitoring. (*Id.* ¶ 8.)

11      They provide a Common Fare menu where dinner included tuna, quinoa, beans, kosher

12  bread, corn tortillas, kosher peanut butter and jelly, hard boiled eggs, as well as fruits and

13  vegetables. (ECF No. 60-2 at 1-8.) Lunch included kosher bread, turkey, kosher peanut butter

14  and jelly, hardboiled eggs, corn tortillas, tuna, chicken bologna, fruit and vegetables.

15  (ECF No. 60-2 at 9-14.) Common Fare breakfast included cereal, oatmeal, "fanna," kosher bread,

16  kosher jelly, hard boiled eggs, milk, Nutri-Cal, as well as fruit. (ECF No. 60-2 at 15-22.)

17      According to defendant Henry, they do their best to deviate from the religious diet as

18  little as possible; however, sometimes like-item substitutions must be made, but they do not

19  substitute with a non-kosher product. (Henry Decl., ECF No. 60-16 at 3 ¶ 10.)

20      Rabbi Rosskamm is the rabbinical administrator for Scroll K, which is an internationally

21  recognized kosher (Kashrus) certification agency. (Rosskamm Decl., ECF No. 60-17 at 3 ¶ 3.)

22  He has been an ordained rabbi for more than 20 years, and has professional experience in matters

23  relating to kosher law. (*Id.* ¶ 4.) Scroll K was retained as a consultant to NDOC to certify

NDOC's Common Fare kosher meal program. (*Id.* at 4 ¶ 8.) Rabbi Rosskamm certified the menu as kosher in 2012. (*Id.*) In addition, NDOC's kosher kitchens and menu have been certified by Scroll K as meeting the requirements of kosher food preparation in a prison setting. Scroll K reviews the preparation area and preparation of Common Fare meals via video. (*Id.* ¶¶ 9, 12.)

Rabbi Rosskamm states that many foods are available with kosher certification, and include but are not limited to, meat, chicken, fish, grain, fruit or vegetable derived products if prepared in accordance with Jewish food laws. Foods that are not kosher include, but are not limited to, meat from animals that do not have split hooves or do not chew their cud, fish species that do not have fins and scales, kosher meat species that were not slaughtered in accordance with Jewish law, kosher meats that were cooked with milk or in equipment used to cook milk, milk products cooked in equipment used to cook meat. Even products that contain only kosher ingredients could be considered non-kosher if they were cooked in equipment used for non-kosher meals. (ECF No. 60-11 at 8, Rosskamm response to interrogatory 17.)

Rabbi Rosskamm also confirms that all eggs served on the Common Fare diet were either purchased precooked with kosher certification or cooked in the kosher dedicated microwave in the kosher Common Fare kitchen; therefore, all the eggs served meet the kosher requirements. (ECF No. 60-11 at 8, Rosskamm response to interrogatory 19.)

Rabbi Rosskamm indicates that meat is permitted at meals which do not include dairy items, except that during the nine days of mourning over the destruction of the Temple, meat is only allowed to be consumed on Saturday. In addition, desserts are permitted at all meals except the last meal eaten before the fast of the 9th of Av. (ECF No. 60-11 at 9, Rosskamm response to interrogatory 20.)

1       In his response to Plaintiff's requests for admission, Rabbi Rosskamm admits that the

2 Common Fare menu has four servings of luncheon meats in a 14-day period. (ECF No. 67-1 at

3 25, response to request for admission 10.) He admits there are no meat portions for breakfast or

4 dinner meals. (*Id.*, response to request for admission 11.) He likewise admits that the Common

5 Fare menu has no dessert servings for the dinner meal. (*Id.*, response to request for admission

6 12.)

7       According to Rabbi Rosskamm, raw fresh fruits and vegetables that are not prone to

8 insect infestation are universally accepted as kosher, even without certification. One exception to

9 this rule is produce from the State of Israel, which requires certification. (ECF No. 60-11 at 6,

10 Rosskamm response to interrogatory 10.) There is no kosher requirement that the produce be

11 kept in a separate cooler, provided the other foods will not drip on the produce. (ECF No. 60-11

12 at 6, Rosskamm response to interrogatory 11.) In his declaration, Rabbi Rosskamm states that

13 kosher law does not require that the fruits and vegetables be served fresh, whole, uncut, and/or

14 unpeeled. Instead, they may be served in other forms such as frozen, canned, peeled, cut, sliced,

15 and/or mixed in with other food items, provided proper verification is available that satisfactory

16 kosher procedures were followed and that they are varieties that are not prone to insect

17 infestation. (Rosskamm Decl., ECF No. 60-17 at 6 ¶ 11(d).)

18       Henry states that most fresh fruits and vegetables would be considered kosher unless they

19 were processed in an "un-kosher" method. She checked with several markets and none carry a

20 "kosher" produce section. The only processed produce they use for Common Fare are shredded

21 lettuce and cabbage and these have an appropriate symbol and are kept in a separate box in the

22 produce room. (ECF No. 67-1 at 128, response to interrogatory 10.)

23

1    Rabbi Rosskamm only certifies the menu and preparation as kosher. The NDOC and

2    dieticians formulate the specific menu as it relates to flavor and nutrition. (Rosskamm Decl.,

3    ECF No. 60-17 at 6 ¶ 13.)

4    Plaintiff submits defendant Baker's interrogatory responses, where she states that she had

5    no involvement in creating the Common Fare menu. (ECF No. 67-1 at 15, response to

6    interrogatories 6, 9.)

7    Henry also was not involved in the creation of the Common Fare menu. (ECF No. 67-1 at

8    127, Henry response to Plaintiff's interrogatories 6, 7.) Henry has no input into the number of

9    meat or other products included in Common Fare meals. (Henry Decl., ECF No. 60-16 ¶ 11.)

10    Instead, the content of the Common Fare program is planned and product is provided by general

11    purchasing under the direction of the state-contracted dietician. (*Id*.)

12    Plaintiff claims that the fruits and vegetables he is served violate his religious beliefs

13    because they do not have a kosher symbol. Plaintiff provides no argument or evidence in

14    response to the declarations of Rabbi Rosskamm and Henry that the fruits and vegetables are

15    kosher even though they do not have a kosher symbol. He simply claims that he requires

16    organically grown produce. As was discussed above, Plaintiff did not allege in his complaint that

17    his faith required an organic diet so as to put Defendants on notice that he was pursuing this

18    theory. Even assuming he had alleged that his sincerely held religious belief required him to

19    consume organic foods, he does not address how or where the Defendants might find organically

20    grown produce that also has a certified kosher symbol. The evidence before the court reflects that

21    produce that is not prone to insect infestation and is not from Israel is universally deemed kosher.

22

23

Similarly, Plaintiff does not refute Defendants' evidence that because the fruits and vegetables are "naturally" kosher, there is no issue storing the produce with that being served to the mainline inmates.

Plaintiff also asserts that the fruits and vegetables are insufficient because they are unclean. His only evidence to support this claim is his statement that sometimes the produce appeared cracked or discolored and "appeared" unwashed. Simply because produce is discolored or cracked does not necessarily mean it is unclean. Similarly, Plaintiff's mere conjecture that an item was not washed is insufficient to raise a genuine dispute of material fact as to whether he was receiving a proper kosher diet. Nor does Plaintiff provide any other specific facts to support this claim, such as what foods he was served, when he was served them, and how frequently.

Next, Plaintiff contends that his kosher diet was insufficient because it did not contain adequate amounts of meat.

Other courts to address the issue have disagreed that not including enough meat in a diet violates religious rights. *See Sprouse v. Ryan,* 346 F.Supp.3d 1347, 1359 (D. Ariz. 2017) (inmate who asserted that he was not served 100% beef for kosher meal did not demonstrate a substantial burden on his religious beliefs); *Fonseca v. Cal. Dep't of Corr. and Rehab.*, No. 14cv787-LAB (BLM), 2015 WL 4172194, at *4 (S.D. Cal. July 10, 2015) (claim that prisoner was served fish more often than beef did not amount to substantial burden on sincerely held religious belief); *Shoemaker v. Williams*, No. CV 10-0826-JO, 2013 WL 528306, at *2 (D. Or. Feb. 11, 2013) (rejecting prisoner's claim that meat-free diet infringed his religious rights).

Plaintiff does not dispute that some meat items are served to Common Fare diet recipients. He does not claim that his religion requires him to eat a certain amount of meat. He has not cited any religious tenet or legal authority that he is entitled to a particular quantum of

meat in his diet. The fact that he is not being served meat as often as he would like does not amount to a substantial burden under the First amendment or RLUIPA.

Moreover, the fact Plaintiff finds his food to be bland, but that does not rise to the level of a constitutional violation.

Plaintiff also briefly claims that his rights were violated because the Common Fare beverages are not required to be kosher. Plaintiff submits Rabbi Rosskamm's responses to discovery, where he was asked about this issue, and responded that there may be beverages that are kosher certified, such as Coke or Sprite, or beverages that do not require kosher certification, such as milk. (ECF No. 67-1 at 26, response to interrogatory 16.) Plaintiff does not identify any specific beverage that he claims was served to him that was not kosher.

In sum, Plaintiff has failed to demonstrate that the fruits and vegetables served to him, the fact that they did not contain a kosher symbol, or the way that they were stored substantially burdened his religious exercise. Nor did he show that the fact that he was not served as much meat as he would like substantially burdened his religious exercise.

While there is a question of fact about the sincerity of Plaintiff's beliefs regarding his religious diet, Plaintiff has not demonstrated in the first place, nor raised a genuine dispute of material fact, that his religious rights to a kosher diet were substantially burdened. Therefore, the court need not reach the analysis of whether there was a legitimate government purpose (under the First Amendment) or the compelling government interest (under RLUIPA). Plaintiff's motion for summary judgment should be denied and Defendants' motion should be granted as to this aspect of his First Amendment and RLUIPA claims.

**c. The Common Fare Preparation**

The court will now turn to Plaintiff's allegations concerning the preparation of Common Fare meals and the environment in which they are prepared and consumed.

Plaintiff states that he worked as a "floater" in the culinary from February to May of 2017, and from September to December of 2018, and saw unsanitary conditions that offended his Messianic belief of cleanliness, including: (1) the Cambro water dispensers were not properly cleaned; (2) the pot used to rinse the rags used to wipe down the tables were not changed throughout the day; (3) porters were instructed to start sweeping as soon as the last tray is served, which kicked up dust while people were still eating. (Pl. Decl., ECF No. 59-1 at 13- ¶¶ 10.)[4] In addition, Plaintiff observed workers in the kitchen bagging up pretzels for lunches while they passed out the common fare meals. (Pl. Decl., ECF No. 59-1 at 14 ¶ 10(e).)

Rabbi Rosskamm maintains that NDOC's kosher kitchens have been certified by Scroll K as meeting the requirements of kosher food preparation in a prison setting. In addition, Scroll K reviews the preparation area and preparation of Common Fare meals via video. (*Id*. ¶¶ 9, 12.)

Rabbi Rosskamm further states that, provided certain conditions are met, kosher law permits Jewish inmates to receive and consume their kosher meals in the prison cafeteria setting regardless of whether other inmates who are not kosher-observant are present or sitting at the same table. To do this, an inmate must have a layer of cellophane or plastic wrapping around it. Jewish prisoners may use that layer to serve as a mat beneath the food container, to preserve the kosher quality of the CFM, and prevent cross-contamination of non-kosher sources into the Common Fare meal. (Rosskamm Decl., ECF No. 60-17 at 5 ¶ 11(a).)

---

[4] Plaintiff also includes a statement that the doors were left open, which made it cold in the dining area; however, this does not implicate his religious practice, but instead appears to be connected to his Eighth Amendment claim that was dismissed.

Finally, Rabbi Rosskamm states that kosher law permits Jewish prisoners to perform the mealtime hand washing cleansing ritual by means of quickly rinsing their hands with water taken from a spigot of a drinking water into a cup set up in the prison cafeteria. (*Id*. ¶ 11(b).)

Plaintiff's complaint alleges that the meals were put on Styrofoam that was wrapped once, and not twice, but it is unclear what would require the items to be wrapped twice. Rabbi Rosskamm states that there must be a layer of plastic wrapping. Plaintiff also claims that he was eating on tables that were unclean. This seems to be based on Plaintiff's conjecture, and moreover, it appears that the layer of plastic wrap would serve as a barrier between the food and the table.

Plaintiff asserts that the Cambro water dispensers were not properly cleaned, but he provides no other facts concerning how they not cleaned or who was responsible for not cleaning them. Insofar as he claims that porters were instructed to sweep when the last tray was served, he does not provide evidence that dust actually made it into his meals on any particular occasion. Plaintiff says that he observed workers in the kitchen bagging up pretzels for lunches while they passed out the common fare meals, but provides no facts about who was doing this or when, or whether Plaintiff received a meal from them that was purportedly cross-contaminated. Importantly, Plaintiff provides no evidence to connect these vague assertions to any particular Defendant. *Hines v. Yousef*, 914 F.3d 1218, 1228 (9th Cir. 2019), *cert. denied sub nom., Smith v. Schwarzenegger,* 140 S.Ct. 159 (2019) ("inmates must show that each defendant personally played a role in violating the constitution.").

In sum, Plaintiff has not produced sufficient evidence to demonstrate, or at least create a genuine dispute of material fact, that Defendants' substantially burdened his ability to practice his religion with respect to the preparation and service of the Common Fare diet. Therefore, the

1  court need not discuss whether NDOC had a legitimate (free exercise) or compelling (RLUIPA)

2  government interest. Summary judgment should be denied as to Plaintiff's motion and granted as

3  to Defendants' motion with respect to this aspect of Plaintiff's First Amendment and RLUIPA

4  claims.

5                 **d. Faith Group Consumables**

6        NDOC's Religious Practice Manual that accompanies AR 810 provides that faith groups

7  that require special consumables for worship, such as grape juice, bread, or kosher items, are

8  responsible for obtaining those items themselves from the canteen, an approved vendor, an

9  approved religious organization, or an outside volunteer or sponsor with prior approval of the

10  warden. (ECF No. 59-2 at 46.)

11        In his declaration, Plaintiff states that he needs to be supplied with bread (matzah) and

12  grape juice for his Sabbath service and for the high holy days. (Pl. Decl., ECF No. 59-1 at 10 ¶

13  9(o).)

14        Defendants argue that Plaintiff may purchase additional items through the canteen or

15  approved vendors, and his canteen purchases show he has the ability to do so.

16        In his response to Defendants' motion, Plaintiff states that he receives a small amount of

17  money from his family every six months. (Pl. Decl., ECF No. 67-2 at 20 ¶ 25.)  He maintains

18  that NDOC should have to provide him these items.

19        AR 810 provides several mechanisms for an inmate to acquire items they need for

20  worship services, such as grape juice or kosher bread, as Plaintiff states he requires for Shabbat

21  and high holy days: he may purchase them from the canteen, from an approved vendor, or an

22  approved religious organization, or he may obtain them from an outside volunteer or sponsor

23  with prior approval from the warden.

1    Plaintiff alleged that he is indigent, and so the prison is required to provide these items

2    for him; however, the evidence reflects that he has funds to purchase a variety of items from the

3    canteen. So it is unclear why Plaintiff has not been able to purchase these items from the canteen.

4    Moreover,  he does not state that he has been unable to obtain the items from any of the outside

5    sources discussed in AR 810. Therefore, it cannot be said that AR 810 substantially burdens his

6    ability to practice his religion when there exist avenues for him to obtain these materials that he

7    has not pursued. Again, the court need not discuss the legitimate (free exercise) or compelling

8    (RLUIPA) government interests of NDOC. Plaintiff's motion for summary judgment should be

9    denied, and Defendants' motion should be granted as to this aspect of his free exercise and

10   RLUIPA claims.

11            **e. Common Fare Agreement**

12            In his briefing, Plaintiff raises the issue that to receive the Common Fare diet he had to

13   sign an agreement that required him to meet certain criteria, including that he would not eat

14   mainline foods or purchase non-kosher items. (Pl. Decl., ECF No. 67-2 at 2 ¶ 5.) He was referred

15   to the warden on June 18, 2018, because he had taken mainline meals on two occasions. (*Id*. ¶ 6.)

16   He now argues that this places a substantial burden on his religious practice.

17            Plaintiff's complaint, and the court's screening order, allowed Plaintiff to proceed with

18   First Amendment Free Exercise Clause, RLUIPA, and equal protection claims based on the

19   allegations that he was not provided a sufficient kosher diet, that the diet was not prepared in an

20   adequately supervised kosher setting, he was not provided grape juice and bread for Sabbath and

21   special holy days, and that he was not provided meat and hot meals like mainline inmates. (ECF

22   Nos. 6, 7.) Plaintiff's complaint did not allege that the Common Fare agreement violated his

23   religious rights. He briefly mentioned that he received a notice of charges for eating non-kosher

items (ECF No. 7 at 5), but that was not the focus of any of his claims. Therefore, the court will not consider his new theory raised for the first time in his motion for summary judgment and response to Defendants' motion for summary judgment.

**C. Equal Protection**

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Hartmann*, 707 F.3d at 1123 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "This does not mean, however, that all prisoners must receive identical treatment and resources." *Id*. (citations omitted). The Plaintiff must establish that "the defendants acted with an intent or purpose to discriminate against [him] based upon membership in a protected class." *Id*. (citations and internal quotation marks omitted). Inmates must be given "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Shakur*, 514 F.3d at 981.

Plaintiff's equal protection claim is premised on his allegations that he can only eat cold foods on Shabbat and high holy days, while regular mainline inmates receive a hot entrée on their holy days, and that mainline inmates are served a significant amount of meat in their diet while the Common Fare meals are primarily vegetarian.

Defendants argue: Plaintiff does not properly allege an equal protection claim, because he has not challenged any statute or regulation that purportedly violates the Equal Protection Clause; he has not established he has been treated differently than other similarly situated inmates; and he does not offer evidence of discriminatory intent. They point out that all inmates may be on the Common Fare diet if they require a kosher diet.

Plaintiff acknowledges that those practicing Messianic Judaism are not to prepare any food on the sabbath. (Pl. Decl., ECF No. 59-1 at 12 ¶ 9(s).)[5] He states that the Sabbath meals are always cold, admitting that this is because of the rule that they cannot cook on the Sabbath. (*Id.* at 15 ¶ 10(i).) Plaintiff posits, however, that NDOC could serve warm meals by giving the inmates their meals for the Sabbath on Friday evening before sunset to eat in their cells, and provide a warming device to warm the food during the Sabbath. (*Id.* ¶¶ 10(i)-(j).)

Defendants contend that these meals are served cold due to the prohibition of using electricity on the Sabbath, which is a requirement of a kosher kitchen. (ECF No. 60-11 at 5, Rosskamm response to interrogatory No. 7; Henry Decl., ECF No. 60-16 at 4 ¶ 12.) Rabbi Rosskamm acknowledges that they can eat hot foods on the Sabbath and high holy days, but only if the meals can be prepared in a manner that does not violate any of the Sabbath restrictions. (ECF No. 60-11 at 9, Rosskamm response to interrogatory 21; ECF No. 67-1 at 27, response to request for admission 18.)

Plaintiff has not produced evidence that Defendants intended to discriminate against him in serving the Sabbath and high holy day meals cold. Instead, the evidence reflects that the meals were served cold on these occasions in order to comply with the requirement that no electricity be used in connection with preparation of these meals. Therefore, Plaintiff's motion should be denied, and Defendants' motion should be granted as to this aspect of his equal protection claim.

Next, Plaintiff contends that he was treated differently from mainline diet inmates because the common fare diet is primarily vegetarian, with a few servings per week of tuna and processed lunch meats, while the mainline menu from 2015 to 2018 had 12 breakfasts per month

---

[5] As was mentioned above, he asserts in his motion that he should not have to go pick up his food on the Sabbath, but this was not an allegation of the complaint; therefore, the court will not address it here.

25

served with meat, 20 lunches per month served with meat, and 28 dinner meals per month served with meat as well as dessert. (Pl. Decl., ECF No. 59-1 at 14-15 ¶ 10(f), (g).

The evidence demonstrates that inmates from various faith groups that require diet modifications from the mainline meal are served the same meals that Plaintiff is served. Moreover, Plaintiff has not provided evidence from which discriminatory intent could be inferred. On the other hand, Defendants present evidence that NDOC consulted with various religious authorities in formulating the Common Fare diet program, and the intention was to accommodate inmates whose sincere religious/spiritual dietary needs could not be met by the master menu. (ECF No. 59-2 at 17, ECF No. 60-10 at 2, AR 814.02.1.) AR 814 states that the Common Fare program is intended to: promote institutional safety, security, discipline and order, consistent with consideration of cost and limited resources; promote efficient planning, ordering, preparation, and delivery of religious/spiritual dietary meals to inmates while conserving financial resources and preventing waste.

In the absence of any evidence of discriminatory intent regarding the quantum of meat in the Common Fare diet, Plaintiff's motion for summary judgment should be denied and Defendants' motion for summary judgment should be granted as to this aspect of his equal protection claim.

In light of the court's findings, it need not reach Defendants' qualified immunity arguments.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Plaintiff's motion for summary judgment (ECF No. 59) and **GRANTING** Defendants' motion for summary judgment (ECF No. 60) and enter judgment accordingly.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: December 15, 2020

William G. Cobb
United States Magistrate Judge